JAMES LILLEY v. THE STATE OF TEXAS.

CIRCUMSTANTIAL EVIDENCE.—See this case for facts held insufficient to warrant a conviction for murder.

APPEAL from San Augustine. Tried below before the Hon. Richard S. Walker.

Henry Hunt, in 1874, was a farmer residing in San Augustine county. On the night of March 7, 1874, about 10 o'clock, while sitting in his room with his family around him, he was murdered. The murderer used a shot gun, with which he fired at Hunt through an open door. Lew Garrett and James Lilley, both freedmen, were indicted for the murder, the first as principal and Lilley as an accomplice. At the time of the murder Lew Garrett, Peter

Nicholson, Amanda Garrett, and Frank Davenport, all freed persons, were tenants, and the only tenants on Hunt's farm. The evidence disclosed that James Lilley was on intimate terms with these tenants, being the father-in-law of Davenport. He resided several miles from Hunt's residence, and seems to have been an exhorter and a leader at prayer meetings in religious exercises. Not long before the murder of Hunt a misunderstanding had occurred between Lew Garrett and himself about some cotton claimed by Garrett's wife, and bad feelings resulted. About one week before the homicide the deceased caused the levying of an attachment on two horses in the possession of Lilley to secure a debt due from Lilley to himself. When the levy was made Lilley remarked: "These Wallace horses have caused more trouble than all the horses in the county, and somebody will be killed about them yet; mark what I say." On the day of the murder Lilley called at the house of deceased, and spent some time there attempting to effect a settlement of accounts. The settlement was not concluded, but it was agreed that a mortgage matter still unsettled should be settled up next morning. Thereupon Lilley left with an invitation from Hunt to turn his horse in Hunt's lot for the night, and to stay with Lew Garrett. This Lilley said he would do, though his horse was not turned in Hunt's lot. Soon after this Lilley and Lew Garrett were observed to meet, but they did not greet each other as men do who have met the first time after absence. On the night of the homicide a prayer meeting was in progress at the house of Peter Nicholson, a freedman, about four or five hundred yards from Hunt's residence. This meeting was attended by the following persons only: Jim Lilley, Lew Garrett, Kate Garrett, his wife, Amanda Garrett, Harvey Dodd, Pete Nicholson, and his wife, all negroes. The morning of the day of the homicide Lilley attempted to borrow an Enfield rifle, saying he had particular use for it that night.

After Lilley's partial settlement with the deceased on the evening of the homicide, and while at Garrett's house, he stated that Hunt had swindled him out of twenty-five dollars and Lew Garrett's wife out of her cotton; that he had swindled him in settlement and taken his horses, though there was no evidence of unkind feeling expressed to Hunt, in the evening during the settlement. Lilley took supper with Lew Garrett, and accompanied Garrett and his wife to the prayer meeting. When Lilley entered, those already assembled were singing, and were interrupted by the following remark made by Lilley: "I'm going to sing to-night, and it will be long remembered and never forgotten." After this Lilley led in singing. After they had prayed and sung twice, Lew Garrett left the house, leaving his hat behind. This was about 9 o'clock. At about 10 o'clock the firing of a gun was heard above the singing distinctly by a witness at the meeting. Just before this Lilley "stopped singing all at once, and looked around and asked, 'Hasn't Lew come back yet?'" Lew's wife answered, "No," and the singing went on. When the gun was fired Amanda Garrett asked, "Was not that a gun fired?" to which Lew Garrett's wife answered, "No; it was not a gun; it was a tree fell;" and the singing continued, and it appeared to the witness that they sang louder. Then the screaming of children was heard, to which Amanda Garrett called the attention of the worshipers; but Lew Garrett's wife said it was only the dogs barking, and they sang still louder. The gun heard at the meeting was fired at Hunt, and it was his children whose screams were heard. The worship was finally stopped by a messenger from Hunt's house bearing information of the murder, and requesting the attendance of the tenants. About this time also Lew Garrett reappeared, "out of breath." They all started to the house of Hunt, Jim Lilley saying, "Come on and let's prove ourselves clear." While walking from the place of prayer to the place of murder Jim Lilley said, "Now you see how

true it's come to pass what I was saying to-night;" to which Lew Garrett answered, "Yes; that's so." The firing of the gun and the screams of children were "loud and distinct, and heard plainly" by me at the prayer meeting. On the arrival of Lilley and the others at Hunt's house, Hunt was found dead from gunshot wounds penetrating his head and neck. After he was shrouded, the white family went to another room in the house, leaving Lew Garrett, Jim Lilley, and two other negroes in the room with the corpse, when Lilley walked up to Hunt's body and said, "There lies the grandest swindler that ever trod shoe leather;" to which Garrett replied, "Yes; but he will never swindle any more."

Lilley's wife, who resided several miles distant from the scene of the murder, was on that occasion left by him sick, and the evidence showed that he had never attended a prayer meeting on Hunt's place before. Frank Davenport, a son-in-law of Lilley, was in Hunt's house at the time of the homicide, sitting against the wall by the side of the opening through which the fatal shot was fired. He did not assist in lifting the dead man from the floor; and when Henry Hunt, son of the deceased, seized a gun and started to the door, Davenport prevented him, telling him not to go out there, that he would be shot. The evidence showed that Garrett had avowed that evening his determination to kill Hunt that night.*

The charge contained the law repeatedly announced by this court applicable to cases of circumstantial evidence. There was a verdict of guilty, and the punishment assessed at hard labor in the penitentiary for life.

*James J. Perkins* for appellant.

*George Clark, Attorney General,* for the State.

REEVES, ASSOCIATE JUSTICE.—The defendant, James Lil-

---

* Garret was afterwards tried, convicted, and executed.

ley, was indicted as an accomplice of Lew Garrett in the murder of Henry Hunt, and being convicted, he applied for a new trial and to arrest the judgment. Both the motions were overruled, and he appealed. The grounds of the motion for the new trial are—

1. Because the verdict of the jury was contrary to law.

2. Because the verdict of the jury was contrary to the evidence.

3. Because the court erred in its charge to the jury; and in arrest of the judgment, because the verdict of the jury does not respond to the allegations in the indictment; the verdict finding the defendant guilty of murder in the first degree, while he is charged in the indictment as being an accomplice.

The jury found the defendant guilty, and assessed his punishment to hard labor in the penitentiary for life.

The main question for consideration is: Does the evidence support the finding? In our opinion it does not. The evidence was circumstantial. It was shown on the trial that both Garrett and Lilley had unkind feelings towards the deceased at the time of the homicide, as evinced by their declarations of hostility towards him just before the killing, and immediately or very soon after that event. Lilley accused the deceased of having swindled him out of $25 in the settlement of their accounts, and complained that Hunt had taken two of his horses. He also accused him with having swindled Garrett's wife out of some cotton.

Whatever else may be said of the conduct of the defendant in this regard, it shows no threat nor any avowed intention to injure the deceased by acts of violence for wrongs done him, real or imaginary. These accusations were made at Garrett's house on the night of the homicide, and only a few hours before it occurred, and Garrett had told the witness Nicholson on that evening that he was going to kill Hunt that night. These circumstances,

followed by the tragic event of the night, if not explained, would not be without force as tending to show a conspiracy to commit the deed with which they are charged. In this connection, however, it must be noticed that Lilley had gone to the house of the deceased on the morning preceding the night of the homicide, and remained there until late in the evening, and was making a settlement of accounts with Hunt, growing out of money transactions between the parties. Not completing the settlement on that day, the deceased told Lilley to stay with Garrett that night, and to return to his house the next morning for the purpose of completing the settlement which was left unfinished the evening before. There can be no doubt of Lilley's ill feeling towards the deceased for some days before the homicide took place about the Wallace horses, as appears from the statement of the witness Thacker, that defendant said that these horses had caused more trouble than all the horses in the county, and that somebody would be killed about them yet, "Mark what I say." This witness refers to Tom Hunt, a nephew of the deceased, as having purchased some of the Wallace horses; but his allusion to Tom Hunt and his connection with the transaction between the deceased and Lilley is not explained. The witness Markham testifies to a conversation he had with Lilley about the time mentioned by Thacker, and in that conversation Lilley made threats against Tom Hunt, and said he had swindled him about a land trade, and that " no man could treat him that way and live," and that he spoke of some trouble he had with deceased about some horses. As presented by the record, it is not free from doubt as to whom the language as given in Thacker's statement was directed, several persons being mentioned. Lilley, as we have seen, was at the house of Garrett on the night of the homicide, and went with Garrett and his wife to the prayer meeting at Peter Nicholson's house. The conduct of Garrett on that occasion, his leaving the meeting during its

progress, the firing of the gun and the killing of Hunt during Garrett's absence, and which he did not account for, point to him as the guilty party in the murder. Lilley's remark that he was "going to sing that night, and it will be long remembered and never forgotten," and what he said on the way to Hunt's—"Now you see how true it's come to pass what I was saying to night"—may have been innocent or criminal as the subject referred to may have been the one or the other. He alluded to something he had said that night, and which Garrett had heard; but whether it was said at the prayer meeting or before, or what it was, is left in doubt from the evidence. As Garrett stayed but a short time at the meeting, and could not have known what was said during his absence, it is probable that Lilley alluded to something he had said before he went to the prayer meeting.

The evidence of Garrett's guilt as principal could only affect Lilly in so far as it might be evidence that he was an accomplice in the murder; and while the evidence shows that Henry Hunt was murdered at his own house, in the presence of his family, under circumstances of great atrocity, we are constrained to say that the evidence, as it appears upon the record, is not, in our opinion, sufficient to support the verdict against him as accomplice, and that the motion for a new trial should have been granted for that reason.

As the case will be reversed and remanded, it becomes unnecessary to give the other objections a separate consideration. We see no objection to the instructions of the court. The law as applicable to the case was presented to the jury in a very clear and full charge; but because the verdict was against the evidence, the case is reversed and remanded.

REVERSED AND REMANDED.